[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 16-10141
_____

D.C. Docket No. 1:14-cv-00865-KOB


TARGET MEDIA PARTNERS,
ED LEADER,

                                        Plaintiffs - Appellants,

versus

SPECIALTY MARKETING CORPORATION,

                                        Defendant - Appellee.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

(February 5, 2018)

Before MARCUS and NEWSOM, Circuit Judges, and BUCKLEW,* District
Judge.

_____

* Honorable Susan C. Bucklew, United States District Judge for the Middle District of Florida,
sitting by designation.

MARCUS, Circuit Judge:

Target Media Partners ("Target Media") appeals the dismissal of its defamation suit. The essential issue raised is whether the *Rooker-Feldman* doctrine can bar a federal suit regarding events occurring long after the entry of a state court decision. We hold that *Rooker-Feldman* cannot bar such a claim.

The *Rooker-Feldman* doctrine eliminates federal court jurisdiction over those cases that are essentially an appeal by a state court loser seeking to relitigate a claim that has already been decided in a state court. The doctrine is designed to ensure that the inferior federal courts do not impermissibly review decisions of the state courts -- a role reserved to the United States Supreme Court. However, the *Rooker-Feldman* jurisdictional bar is a narrow one. In invoking the limitation on review of state court decisions, the federal courts must also ensure that litigants whose claims are properly within the cognizance of the courts are not denied a hearing.

The parties before us today previously litigated a breach-of-contract suit in Alabama's state courts. Target Media then commenced a lawsuit in federal district court raising a defamation claim concerning a letter sent after the completion of the Alabama case. That letter discussed, in some detail, the state trial and verdict. The federal district court concluded that Target Media's federal suit was "inextricably

intertwined" with the previous state court suit and, therefore, dismissed the federal claim as being jurisdictionally barred under the *Rooker-Feldman* doctrine.

After thorough review, however, we conclude that the claim brought in federal court was not "inextricably intertwined" with the Alabama case, the claim was not barred by the *Rooker-Feldman* doctrine, and the district court has jurisdiction to entertain it.  The federal suit did not seek -- indeed could not have sought -- to relitigate claims decided by a state court.

## I.

## A.

Target Media and Specialty Marketing both publish magazines directed at the truck driving industry.  These publications are made available free of charge at various locations.  The magazines include advertisements of interest to members of the truck driving industry.  *Target Media Partners Operating Co., LLC v. Specialty Mktg. Corp.*, 177 So. 3d 843, 848 (Ala. 2013).  In addition to publishing magazines, Target Media distributes publications to locations concentrated in the southeastern United States.

In 2002, Target Media and Specialty Marketing entered into a contract whereby Target Media agreed to widely distribute *Truck Market News*, the publication of Specialty Marketing.  The contract provided for Specialty Marketing to take care of printing and furnishing copies of *Truck Market News* to various

distribution points.  Target Media would provide distribution of *Truck Market News* twice a month, including "[h]and [d]elivery and display" along with "[d]ocumentation that includes proof of delivery, returned (non-picked up) magazines, . . . and photos upon request."  *Id.* at 849.  The contract tallied 275 individual locations to which *Truck Market News* would be delivered for a monthly contractual fee finalized at $9,750.  *Id.* at 849–50.  The contract additionally provided that the "price also includes distribution in our racks."  *Id.* at 849.

Specialty Marketing printed between 36,000 and 42,000 copies of *Truck Market News* each month.  *Id.* at 850.  Under the arrangement intended by the contract, Target Media's drivers were required to deliver copies of *Truck Market News* to various stops along their routes; these copies would be used to stock magazine display racks.  *Id.* at 850–51.  However, at a meeting in early 2007, one of Target Media's delivery drivers provided the owners of Specialty Marketing descriptions as well as photographs suggesting that *Truck Market News* was not being distributed as planned. *Id.* at 852–53.

In 2007, Specialty Marketing sued Target Media and other related parties in Alabama state court for, among other things, breach of contract, promissory fraud, and fraudulent misrepresentation.  *Id.* at 853.  A number of former Target Media employees testified at the subsequent jury trial that during the period under the contract, Target Media engaged in a practice of discarding rather than distributing

4

many brand new copies of *Truck Market News*. *Id.* at 851–52. Witnesses and photographic evidence indicated that still–wrapped and bundled copies of *Truck Market News* were disposed of when, at the direction of the company, Target Media magazines were given priority in loading, and insufficient room was left on delivery vehicles for other publications. *Id.* at 851. Additional copies were disposed of at intended places of delivery because company instructions on the placement of publications in display racks left room only for Target Media publications. *Id.* The former employees also testified that records meant to be provided under the distribution agreement -- reports showing how many copies of *Truck Market News* were remaining on display from a previous issue when new issues were delivered -- were falsified at the direction of Target Media in order to make unavailable figures "look good." *Id.* at 851–52. One of Specialty Marketing's owners calculated that the company had paid around $430,000 under the delivery contract and incurred over $900,000 in printing costs for magazines that were mostly abandoned. *Id*. at 853.

In May 2010, trial verdicts were returned against Target Media awarding Specialty Marketing compensatory and punitive damages totaling approximately $2.36 million for breach of contract, promissory fraud, and fraudulent misrepresentation. *Id.* at 854. The jury also returned a verdict against Specialty Marketing on a breach-of-contract counterclaim, awarding damages of $48,800.

*Id.*  The Supreme Court of Alabama upheld the verdicts in September 2013 and the Supreme Court denied certiorari.  *Id.* at 847; *Target Media Partners Operating Co., LLC, v. Specialty Mktg. Corp.*, 135 S. Ct. 1702 (2015).

Around March 21, 2014, long after the state court lawsuit had been completed, Specialty Marketing mailed materials to advertising agencies that worked with Target Media.  Included in the mailed packages was the following letter:

TO WHOM IT MAY CONCERN:

For your information I am sending you the following:

1) Circuit Judge Howell's Order of May 11, 2010 showing jury verdict against Target Media and Ed Leader for Breach of Contract, Promissory fraud and Fraud totaling over $2.4 Million.

(1a) Is the Alabama Supreme Court Ruling of April 19, 2013, affirming all of these counts against these Defendants. With interest, the amount now owed to me is $3.4 Million.

2) Glennis Ford's sworn testimony of her instructions to commit fraud.

3) Rodney Deen's sworn testimony of his throwing away of hundred [*sic*] of thousands of brand new undelivered books every month as instructed by Target Media Partners.

4) Gary Freeman's sworn testimony of his work to get the books off the loading dock where he worked at the Gypsum Plant near the Target Media warehouse.

5) Gordon Adams' trial testimony of the fraud he was made to commit in order to keep his job with Target Media.

6) Ed Leader's trial testimony showing his knowledge and participation in the actions that resulted in the jury verdict that has been upheld by the Alabama Supreme Court.

7) Gary Poe's two pages of sworn testimony about the tons of brand new books left at the Gypsum Plant by Target Media Partners.

8) Wallace Adams' trial testimony of his forced participation in the fraud that resulted in the $2.4 Million jury verdict against Ed Leader and Target Media.

9) A CD disc of 258 pictures of the brand new books being thrown away without being delivered, most of the books are Target Media books with ads sold by Target Media Partners and their ad agency.

It is my belief that you and everyone else that has any business or personal dealings with Target Media Partners, their owners and officers, need to know of this documented, trail [*sic*] proven fraud by them. All of which has been upheld by the Alabama Supreme Court. Further, it is my belief that many others have been and continue to be, victims of this fraud.

B.

On May 9, 2014, Target Media filed this defamation action against Specialty Marketing in the United States District Court for the Northern District of Alabama, seeking injunctive relief and damages and asserting claims for libel *per se* as well as fraudulent misrepresentation. A magistrate judge recommended that the district court dismiss the action for lack of subject matter jurisdiction. First, the magistrate considered the portions of the letter that discussed state court events and trial testimony. The magistrate concluded that a federal district court should not be able to hear Target Media's federal claims related to those parts of the letter because of

7

*Rooker-Feldman*, reasoning that the letter's presentation of trial testimony was "inextricably intertwined" with the Alabama state court decision, and that the resolution of the federal claim would have the material effect of nullifying the state court judgment.

The magistrate judge went on to examine the first sentence of the final paragraph from the letter in question, which read this way: "*It is my belief that you and everyone else that has any business or personal dealings with Target Media Partners, their owners and officers, need to know of this documented, trail* [sic] *proven fraud by them.*" The magistrate reached the merits, observing that this was "simply a statement of [Specialty Marketing's] personal opinion, which is not libelous *per se*" and noted that this statement of opinion "does not qualify as defamatory." Finally, the magistrate considered the letter's concluding sentence: "*Further, it is my belief that many others have been and continue to be, victims of this fraud.*" The court found that a "plain reading" of this statement did not, as Target Media had asserted, allege ongoing fraud. Rather, the sentence referenced "the fraudulent scheme to which [Specialty Marketing] fell victim between 2002 and 2006." Because this statement referenced the fraud at issue in the parties' state court dispute, the allegation that the speech constituted defamation was also "inextricably intertwined" with the state court judgment. The magistrate stated

further that since truth is a defense to defamation, "to find that Specialty Marketing committed libel . . . it would be necessary to overturn the state verdict."

The district court adopted the magistrate judge's Report and Recommendation and dismissed the action for lack of subject matter jurisdiction. On *de novo* review, the district court agreed that the federal suit was "inextricably intertwined" with the state court decision for *Rooker-Feldman* purposes, and that the letter did not allege a continuing or current fraud. Following the reasoning of the magistrate judge, the district court determined that a federal defamation claim regarding the statements made in the letter was barred by *Rooker-Feldman*.

## II.

We review the district court's dismissal of the defamation case *de novo*. *See, e.g.*, *Doe v. Fla. Bar*, 630 F.3d 1336, 1340 (11th Cir. 2011) ("We review *de novo* a district court's decision that the *Rooker-Feldman* doctrine deprives it of subject matter jurisdiction.").

Upon review, we hold that the district court improperly denied subject matter jurisdiction and erroneously dismissed Target Media's defamation claim on *Rooker-Feldman* grounds.

## A.

*Rooker-Feldman* raises a question about our subject matter jurisdiction, an issue we are always obliged to examine. *See, e.g.*, *Reahard v. Lee Cty.*, 978 F.2d

1212, 1213 (11th Cir. 1992). The *Rooker-Feldman* doctrine is a limitation on the jurisdiction of the inferior federal courts. This limitation is intended to prevent the federal courts from hearing what are essentially appeals from state court decisions, which may only be heard by the United States Supreme Court. The doctrine is rooted in an understanding that Congress has given only the United States Supreme Court the ability to hear an appeal from a state court decision. *See* 28 U.S.C. § 1257(a) ("Final judgments or decrees rendered by the highest court of a State in which a decision could be had, may be reviewed by the Supreme Court [where appealed on certain grounds]."); *see also Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 292 (2005) ("§ 1257, as long interpreted, vests authority to review a state court's judgment solely in [the Supreme] Court."). The federal district courts, meanwhile, have been given original, not appellate, jurisdiction. *See, e.g.*, 28 U.S.C. §§ 1331, 1332.

The foundation of the *Rooker-Feldman* doctrine rests on two United States Supreme Court cases. In the first one, *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923), the Supreme Court rejected, as falling outside the jurisdiction of the district court, a suit that sought to have an Indiana state court's judgment "declared null and void." *Id.* at 414. There, the parties in federal court were the same parties who had litigated in state court. *Id.* Though the federal suit raised constitutional claims, "it was the province and duty of the state courts to decide" such claims. *Id.*

10

at 415.  The Supreme Court noted that under jurisdiction-conferring statutes, "no court of the United States other than [the Supreme] [C]ourt could entertain a proceeding to reverse or modify the judgment." *Id.* at 416.

Sixty years later in *D.C. Court of Appeals v. Feldman*, 460 U.S. 462 (1983), the Supreme Court held that a federal district court was without the power to review a District of Columbia court's individualized adjudication, even though the federal court could review general challenges to District of Columbia court rules. The decision which could not be considered in an inferior federal court, regarding whether certain individuals should be permitted to sit for the bar examination, was "judicial in nature," and "a United States District Court has no authority to review final judgments of a state court in judicial proceedings," including claims that were "inextricably intertwined" with the state court decision.  *Id.* at 479, 482, 486. However, a district court *could* hear allegations regarding the facial validity of a state court rule. *Id.* at 487.

More recently, the Supreme Court concluded that the inferior federal courts had been applying *Rooker-Feldman* too broadly.  *Exxon Mobil*, 544 U.S. at 283 ("[T]he [*Rooker-Feldman*] doctrine has sometimes been construed to extend far beyond the contours of the *Rooker* and *Feldman* cases.").  The Supreme Court expressly limited *Rooker-Feldman*'s applicability.  In *Exxon Mobil Corp. v. Saudi Basic Industries Corp.*, 544 U.S. 280 (2005), the Supreme Court clarified that

11

*Rooker-Feldman* bars only that class of cases in which federal litigants seek reversal of state court decisions.  The doctrine is "confined to cases of the kind from which the doctrine acquired its name: cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments."  *Id.* at 284.  The Supreme Court has also clarified that "*Rooker-Feldman* is not simply preclusion by another name."  *Lance v. Dennis*, 546 U.S. 459, 466 (2006) (again stating that *Rooker-Feldman* applies "where a party in effect seeks to take an appeal of an unfavorable state-court decision," *id.*).  The doctrine neither "override[s] or supplant[s] preclusion doctrine" nor "augment[s] the circumscribed doctrines that allow federal courts to stay or dismiss proceedings in deference to state-court actions."  *Exxon Mobil*, 544 U.S. at 284.

Following *Exxon Mobil*, our Circuit recognized the limited scope of the *Rooker-Feldman* doctrine as it has been described by the Supreme Court.  We have since declined to apply our previous test for *Rooker-Feldman* analysis and have instead hewn closely to the language of *Exxon Mobil*.  *See Nicholson v. Shafe*, 558 F.3d 1266, 1274 (11th Cir. 2009).  Consistent with the directions of the Supreme Court, we now apply *Rooker-Feldman* to bar only those claims asserted by parties who have lost in state court and then ask the district court, ultimately, to review

and reject a state court's judgments. *Id.* at 1268 (quoting *Exxon Mobil*, 544 U.S. at 284).

To determine which claims invite rejection of a state court decision, we continue to apply an inquiry similar to the one that preceded *Exxon Mobil*. We continue to consider whether a claim was either (1) one actually adjudicated by a state court or (2) one "inextricably intertwined" with a state court judgment. *See Casale v. Tillman*, 558 F.3d 1258, 1260 (11th Cir. 2009) (per curiam). And we have continued to describe a claim as being "inextricably intertwined" if it asks to "effectively nullify the state court judgment, or it succeeds only to the extent that the state court wrongly decided the issues." *Id.* (internal quotation marks and citation omitted).

Notably, however, a federal claim is not "inextricably intertwined" with a state court judgment when there was no "reasonable opportunity to raise" that particular claim during the relevant state court proceeding. *Id.* (quoting *Powell v. Powell*, 80 F.3d 464, 467 (11th Cir. 1996)). Thus, the class of federal claims that we have found to be "inextricably intertwined" with state court judgments is limited to those raising a question that was or should have been properly before the state court. For example, in *Casale*, we held that *Rooker-Feldman* barred a federal district court from exercising jurisdiction where an ex-husband sought an injunction to stop domestication of out-of-state contempt orders. *Id.* at 1261.

13

There, though the federal and state claims were different in name, their essential inquiry was the same -- whether there was a requirement to pay amounts due under a divorce decree. *Id.* Thus, where arguments, even ones grounded in federal law, were not "offer[ed] . . . to the state courts -- or if the state courts did not buy them -- [they could not be] unload[ed] . . . by attempting to sell them" in federal court. *Id.*

## III.

That *Rooker-Feldman* cannot apply to the case at hand is stated simply: the defamation claim brought by Target Media in federal district court does not invite the review and rejection of the Alabama state court judgment. *See Nicholson*, 558 F.3d at 1268. Here, there are multiple reasons why the requirements found in *Rooker-Feldman* have not been met.

## A.

Most starkly, as a matter of temporality, it's difficult to imagine a case where a federal court could be barred by *Rooker-Feldman* from hearing a claim that arose only after the relevant state court decision had been issued. Indeed, in this case, the Alabama state court could not possibly have adjudicated a question arising from conduct that occurred after it had finally decided the breach-of-contract dispute between these parties. This temporal sequence forecloses the applicability of *Rooker-Feldman* and removes our need to inquire into whether the

claim presented is identical to or "inextricably intertwined" with a previously decided state court claim. A claim about conduct occurring after a state court decision cannot be either the same claim or one "inextricably intertwined" with that state court decision, and thus cannot be barred under *Rooker-Feldman*.

More specifically, the timing of the alleged defamatory speech means that it cannot be grounds for a *Rooker-Feldman* bar. Well before *Exxon Mobil*'s limitation of the doctrine, this Court recognized that *Rooker-Feldman* is not a bar to jurisdiction where "[an] issue did not figure, and could not reasonably have figured, in the state court's decision." *Wood v. Orange Cty.*, 715 F.2d 1543, 1547 (11th Cir. 1983) ("[A]n issue that a plaintiff had no reasonable opportunity to raise cannot properly be regarded as part of the state case."). On the facts before us, the Alabama jury trial rendered verdicts against Target Media on breach of contract, promissory fraud, and fraudulent misrepresentation as well as a breach-of-contract verdict against Specialty Marketing in 2010. *Target Media Partners*, 177 So. 3d at 854. The Supreme Court of Alabama upheld those verdicts in 2013. *Id.* at 847. But the federal complaint arises only on claims related to a letter that both parties agree was sent in March 2014. The allegedly defamatory letter postdated both the decision of the Alabama jury and the final affirmance of the trial court's judgment by the Supreme Court of Alabama. Quite simply, the Alabama state court's decision could not reasonably -- and indeed could not possibly -- have considered

15

language in letters sent well after the conclusion of the trial and Target Media's state court appeal. An allegedly tortious act occurring long after the state court rendered its judgment cannot be barred by *Rooker-Feldman* because there was no opportunity to complain about the allegedly injurious act in the state court proceedings.

## B.

Moreover, a defamation claim cannot be the same claim as, or one "inextricably intertwined" with, the Alabama court judgment where the *nature* of the claims reveals that they present distinct issues. Here, the essence of the Alabama suit is distinct from the essence of the federal suit. The legal issues presented to the Alabama court inquired about the contractual obligations between the parties. The main legal issue presented in this federal claim, however, is whether the speech contained in Specialty Marketing's letter was defamatory in nature. The factual issues before the Alabama court included whether the conduct of Target Media constituted breach of its contractual duties, promissory fraud, and fraudulent misrepresentation. The factual issues in this suit concern the meaning and veracity of the words found in Specialty Marketing's letter.

It is true that the factual background of the defamation claim raised in federal court today -- the contents of the letter -- does *relate* to the state court judgment and so is "intertwined" in some sense. Nevertheless, it is not merely

16

"any" interconnection of state and federal suits that constitutes the type of "inextricably intertwined" issues that are relevant for *Rooker-Feldman* purposes. Rather, the question posed to the federal court must be intertwined with the "state court judgment" not only to the extent that it involves the state court proceedings but also to the extent that a *determination* reached by the state court would have to be relitigated in federal court. It is not the factual background of a case but the judgment rendered -- that is, the legal and factual issues decided in the state court and at issue in federal court -- that must be under direct attack for *Rooker-Feldman* to bar our reconsideration. The *Rooker-Feldman* bar is avoided in this suit because the Alabama state court could rule on the breach-of-contract and fraud claims between these parties without deciding the defamation claim related to this letter. Likewise, a federal court could decide on the merits of the defamation claim without rendering a judgment on the merits of the breach-of-contract claim.

The critical distinction between materials relevant to the factual background surrounding a state case and the actual judgment rendered by a state court has been emphasized by this Court both before and after *Exxon Mobil*. As we have said, "our [*Rooker-Feldman*] decisions focus on the federal claim's relationship to the issues involved in the state court proceeding." *Goodman ex rel. Goodman v. Sipos*, 259 F.3d 1327, 1333 (11th Cir. 2001) (cited in *Casale*, 558 F.3d at 1260). In *Goodman*, two claims brought in federal court were barred by *Rooker-Feldman*

17

while a third was not. *Id.* The two barred claims involved challenges to the legality of evidence and proceedings used by the state court, both issues that were or could have been decided by the state court. *Id.* at 1334. However, a third claim challenged the legality of a search that was proximate to events leading to the state court proceedings but was not the source of any "evidence or other information" used in the state court. *Id.* A challenge to the legality of the search, then, could not have been considered in the state court. That issue was not "inextricably intertwined" with the relevant state court decision because it was not "premised on the state court having ruled erroneously." *Id.*

Like the third, non-barred claim in *Goodman*, Target Media's challenge to the allegedly defamatory language in the letter here could not have been considered in the Alabama court proceeding. There may be a factual relationship between these parties' trial in Alabama state court and the contents of the letter, just as there was a relationship between the *Goodman* search and the events that led to the state court proceeding there. However, Target Media does not contend (nor could it) that the Alabama courts had ruled erroneously in the state court trial. Instead, it claims only that the language from the letter about the trial is libel and misrepresentation, a claim that was not and could not have been adjudicated in Alabama state court and is not barred by *Rooker-Feldman*.

18

Finally, the defamation claim was independent of the breach-of-contract suit litigated in state court.  Under *Exxon Mobil*, the Supreme Court has observed that the *Rooker-Feldman* doctrine is so limited that even where a truly new claim in federal court does require some reconsideration of a decision of a state court, such a claim still might not be barred: "If a federal plaintiff 'present[s] some independent claim, albeit one that denies a legal conclusion that a state court has reached in a case to which he was a party . . . , then there is jurisdiction and state law determines whether the defendant prevails under principles of preclusion.'" *Exxon Mobil*, 544 U.S. at 293 (alterations in original) (quoting *GASH Assocs. v. Rosemont*, 995 F.2d 726, 728 (7th Cir. 1993)).

Finding a claim to be barred by *Rooker-Feldman* requires that it amount to a direct attack on the underlying state court decision.  A challenge can be contextually similar to an issue adjudicated in state court without activating *Rooker-Feldman*.  The propriety of the allegedly defamatory speech here was not the specific question addressed by the relevant state court decision; rather, it is an independent claim.  *Feldman* itself recognized the distinction.  There, in a challenge to the District of Columbia's bar admission requirements, federal district courts lacked subject matter jurisdiction to review particular adjudications of individuals' applications for bar admission.  *Feldman*, 460 U.S. at 482.  However, the federal district courts *did* have jurisdiction to examine a general constitutional

19

challenge to the validity of the bar admissions scheme. *Id.* at 482–83. This Court has similarly held that *Rooker-Feldman* bars federal district court jurisdiction over appeals from particular state court adjudications but not over challenges to general rules and procedures. *See Berman v. Fla. Bd. of Bar Exam'rs*, 794 F.2d 1529 (11th Cir. 1986); *Kirkpatrick v. Shaw*, 70 F.3d 100, 102 (11th Cir. 1995). Even if the general subject matter of the instant suit involves some of the factual background found in the state court trial, the suit here is not barred by *Rooker-Feldman* because the claims are independent from those that constituted the Alabama case.

A challenge to holdings actually adjudicated by a state court plainly would be barred by *Rooker-Feldman*. Thus, for example, post-*Exxon Mobil*, this Court has held that an as-applied challenge to state DNA access procedures was barred by *Rooker-Feldman*. *Alvarez v. Att'y Gen.*, 679 F.3d 1257, 1263 (11th Cir. 2012). In still another case upholding the dismissal of a § 1983 claim as *Rooker-Feldman*–barred, we emphasized that a challenged search had been adjudicated to be lawful by the relevant state court. *Datz v. Kilgore*, 51 F.3d 252, 254 (11th Cir. 1995). Here, the state court was not asked, and could not have been asked to answer the question of whether Specialty Marketing's letter was libelous. The contextual similarity of Target Media's federal claim to the prior state court decision cannot suffice to bring the claim within *Rooker-Feldman*'s ambit.

20

Specialty Marketing claims, however, that the "real purpose" behind Target Media's federal suit is to "distract from collection of the [Alabama state court] judgment." But even in situations where such a purpose does exist, a suit may be brought in federal court, and the federal court cannot avoid jurisdiction under *Rooker-Feldman*, so long as the federal claim that is raised is independent of any claim raised in state court. While Specialty Marketing may assert some ongoing frustration from the state suit, the injury complained of in the defamation action was not caused by the Alabama state court judgment.

To be clear, we make no determination today about the merits of the defamation claim.[1] We simply hold that the district court had the power, and therefore the unflagging obligation, to hear the case the parties presented. Because there was no reasonable opportunity to raise the instant claim in Alabama's state courts, and because the claim was not "inextricably intertwined" with the judgment rendered in Alabama court, *Rooker-Feldman* cannot bar this suit.

**VACATED and REMANDED.**

---

[1] Target Media says that the district court impermissibly went to the merits of the underlying defamation claim in addressing its subject matter jurisdiction. We agree that the reasoning below blended consideration of the *Rooker-Feldman* question with some statements that appear to implicate the merits of the defamation suit. However, because we reverse the *Rooker-Feldman* holding and determine that federal jurisdiction was proper, any such consideration is irrelevant today.

NEWSOM, Circuit Judge, concurring:

I concur in the Court's judgment and join its opinion.  I write separately only to underscore two points—one small, the other less so.  As for the former, I believe, for reasons I will explain briefly, that the governing Supreme Court precedent— *Exxon Mobil Corp. v. Saudi Basic Industries Corp*., 544 U.S. 280 (2005)—makes this case even more straightforward than the lead opinion here indicates.  And as for the latter, I also believe—for reasons I will explain at slightly greater length—that the Supreme Court's *Exxon* decision is best understood as having narrowed what has been called the "so-called *Rooker-Feldman* doctrine," *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 18 (1987) (Scalia, J., concurring), to its barest essence.

## I

As an initial matter, to resolve this case, I would cut straight to the "final[]" consideration that the Court's opinion emphasizes.  Maj. Op. at 19.  In *Exxon*, the Supreme Court unanimously held that the *Rooker-Feldman* doctrine does *not* "stop a district court from exercising subject-matter jurisdiction simply because a party attempts to litigate in federal court a matter previously litigated in state court."  544 U.S. at 293.  To the contrary, the Court clarified, "[i]f a federal plaintiff presents

22

some independent claim, albeit one that denies a legal conclusion that a state court has reached in a case to which he was a party …, then there *is* jurisdiction and state law determines whether the defendant prevails under principles of preclusion." *Id*. at 293 (emphasis added; citation, internal quotation marks, and alteration omitted).

The way I see it, that is precisely this case. Following the Alabama courts' final resolution of Specialty Marketing's suit for breach of contract and fraud, Target Media filed in federal court what is by all accounts an "independent claim"—namely, for defamation arising out of Specialty's post-judgment letter. To be sure, Target's defamation action may seek, at some level, to reopen a "matter previously litigated in state court"—that is, the truth of whether it engaged in fraud in its dealings with Specialty, as the Alabama courts found and Specialty's letter asserted. And just as surely, Target's defamation claim, which bottoms on a challenge to the truth of Specialty's letter's allegation, "denies a legal conclusion"—in particular, that Target engaged in fraud—"that a state court … reached in a case to which [Target] was a party." But these are precisely the circumstances that the Supreme Court envisioned in *Exxon*—and with respect to which it held that *Rooker-Feldman* does *not* pose a bar. So very simply, I just don't see how the district court's dismissal here can survive the clear teaching of *Exxon*. For me, anyway, that's the beginning and the end of this particular case.

## II

Now having said that, let me take a step back.  The Supreme Court's *Exxon* decision was a watershed in the so-called life of this so-called doctrine. Emphasizing that a number of lower courts had wrongly construed *Rooker-Feldman* to "extend far beyond" its original contours, 544 U.S. at 283, the Supreme Court quite intentionally sought to "rein in" those overeager applications. 18B C. Wright, A. Miller *et al.*, *Federal Practice & Procedure* § 4469.1 (2d ed. 2018).  To that end, the Court repeatedly stressed that the *Rooker-Feldman* doctrine is "narrow," "confined," and "limited," *id*. at 284, 291, and it took great pains to state—and then restate and restate—that the doctrine applies to preclude *only* those federal-court actions that actually seek to "reverse," *id*. at 283, "reject[]," *id*. at 284, "overturn," *id*. at 292, or "undo," *id*. at 293, state-court judgments.  On the flip side, the Court clarified (as just noted) that *Rooker-Feldman* does *not* bar a federal-court suit simply because it relitigates a "matter" previously argued—or even "denies a legal conclusion" previously reached—in a state-court action.  *Id*. at 293.

Why the renewed emphasis on the doctrine's narrowness?  Several reasons. First, *Rooker-Feldman* is a novelty in the law.  It purports to oust federal courts' subject-matter jurisdiction, but unlike most jurisdictional limitations, it is entirely "judge-made."  18 J. Moore, *Moore's Federal Practice* § 133.33[1][a], at 133-60

(3d ed. 2017).  The doctrine's jurisdictional *restriction* rests on what have been called the "perceived implications" of other jurisdictional *grants*.  Wright & Miller, *supra*, § 4469.1.  For instance, 28 U.S.C. § 1257 gives the United States Supreme Court appellate jurisdiction to review the final decisions of state courts—and thus, the theory goes, by negative implication denies to lower federal courts a similar authority.  So too, 28 U.S.C. §§ 1331 and 1332 together give federal district courts jurisdiction to hear and decide cases as an original matter—and thus, *Rooker-Feldman* posits, by negative implication denies those courts any appellate capacity.  None of this is necessarily to say that the inferences that underlie the *Rooker-Feldman* doctrine are illogical or invalid.  But it is to say that they are inferences, which—especially given that we're talking about subject-matter jurisdiction— should be reason enough to curb enthusiasm.

Second, the *Rooker-Feldman* doctrine has no real forbears and, at least in the Supreme Court itself, no progeny.  As the Court emphasized in *Exxon*, it has applied the doctrine to foreclose federal-court jurisdiction only twice, in the doctrine's namesake decisions, *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923), and *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983).  Both were "wheelhouse" cases, so to speak, in that both were transparent, frontal assaults on state-court judgments.  In particular, in *Rooker*, a plaintiff sued in federal court expressly asking to have a state-court order "declared null and void."

25

263 U.S. at 414.  Only slightly less conspicuously, in *Feldman*, disappointed bar applicants "commenced a federal-court action against the very [state-level] court that had rejected their applications," seeking to review and reverse that court's denial decision.  *Exxon*, 544 U.S. at 283 (describing *Feldman*).  "Since *Feldman*," the Supreme Court "has never applied *Rooker-Feldman* to dismiss an action for want of jurisdiction."  *Id.* at 287.  To the contrary, in every instance in which the issue has arisen, the Court has found the doctrine inapplicable.  *See, e.g.*, *Lance v. Dennis*, 546 U.S. 459 (2006); *Exxon*, 544 U.S. 280; *Verizon Md. Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635 (2002); *Johnson v. De Grandy*, 512 U.S. 997 (1994).

A final reason for circumspection: As the Supreme Court emphasized in its most recent *Rooker-Feldman* decision, "[n]either *Rooker* nor *Feldman* elaborated a *rationale* for a wide-reaching bar on the jurisdiction of lower federal courts." *Lance*, 546 U.S. at 464 (emphasis added).  And in fact, far from articulating any good reason to extend the judge-made jurisdictional rule, the Court has repeatedly warned that affirmative danger lurks in loose interpretations of *Rooker-Feldman*— among them, that the doctrine risks "superseding the ordinary application of preclusion law pursuant to 28 U.S.C. § 1738."  *Exxon*, 544 U.S. at 283.  It's certainly not clear that *Rooker-Feldman* adds much of substance to preexisting preclusion doctrine.  Many of the same federal-court suits that the Supreme Court

in *Exxon* held will survive *Rooker-Feldman*'s bar—those, for example, that seek to reopen "matter[s]" or "legal conclusion[s]" determined in state courts—will likely end up precluded under traditional res judicata or collateral estoppel principles. *Cf.* Wright & Miller, *supra*, § 4469.1 ("This cabining of the *Rooker-Feldman* doctrine will not lead to widespread federal interference with state-court judgments. Claim and issue preclusion provide ample protection.").[1]

If a broad-ranging *Rooker-Feldman* doctrine merely duplicated ordinary preclusion rules, "it might seem harmless enough." *Id.* But *Rooker-Feldman* doesn't just duplicate preclusion doctrine—it changes it in significant ways. Initially, and most obviously, an expansive *Rooker-Feldman* bar would take what are ordinary, waivable affirmative defenses—res judicata and collateral estoppel— and "jurisdictionalize" them, meaning that federal courts would be obliged (as they did here) to assess them *sua sponte*. *See, e.g.*, *Exxon*, 544 U.S. at 284 (observing that *Rooker-Feldman* implicates federal courts' "subject-matter jurisdiction"); *University of S. Ala. v. Am. Tobacco Co.*, 168 F.3d 405, 410 (11th Cir. 1999) ("[A] federal court is obligated to inquire into subject matter jurisdiction *sua sponte* whenever it may be lacking.").

---

[1] Indeed, in this case, Target may well face substantial preclusion arguments on remand. *See* Oral Arg. Tr. at 11:20 (Question: "Will you [*i.e.*, Target] face preclusion problems even if you get beyond *Rooker-Feldman*?" Answer: "May very well. And I don't think *Rooker-Feldman* should be used as an issue preclusion tool, which is sort of what happened here.").

27

Separately, and to me more perversely, the *Rooker-Feldman* doctrine *federalizes* whatever ground it is permitted to occupy.  Under the Full Faith and Credit Act, 28 U.S.C. § 1738, a federal court considering whether an existing state-court judgment is entitled to res-judicata or collateral-estoppel effect is obliged to apply *state* preclusion law.  *See Kremer v. Chemical Constr. Corp.*, 456 U.S. 461, 481–82 (1982).  By "allow[ing] the States to determine, subject to the requirements of the statute and the Due Process Clause, the preclusive effect of judgments in their own courts," Section 1738 embodies and underscores fundamental "concerns of comity and federalism."  *Marrese v. Am. Acad. of Orthopedic Surgeons*, 470 U.S. 373, 380 (1985).  As the Supreme Court emphasized just a year after deciding *Exxon*, an overbroad understanding of *Rooker-Feldman* subverts those very same concerns: "Incorporation of preclusion principles into *Rooker-Feldman* risks turning that limited doctrine into a uniform federal rule governing the preclusive effect of state-court judgments, contrary to the Full Faith and Credit Act."  *Lance*, 546 U.S. at 466.  Ironically, therefore, a rule that on its face might seem to protect state prerogatives—in the sense that it limits the circumstances in which federal courts can second-guess state-court judgments[2]—could, if allowed to balloon,

---

[2] *See, e.g.*, Suzanna Sherry, *Judicial Federalism in the Trenches: The* Rooker-Feldman *Doctrine in Action*, 74 Notre Dame L. Rev. 1085, 1101 (1999) ("The *Rooker-Feldman* doctrine … is specifically about federalism—under what circumstances may federal courts other than the Supreme Court sit in judgment on state courts?").

28

actually *undermine* federalism interests by displacing vast swaths of state preclusion law.

*   *   *

For all of these reasons, it seems to me, the Supreme Court was quite right in *Exxon* to call a halt to lower courts' overbroad invocations of *Rooker-Feldman*. Because today's opinion is faithful to *Exxon* and its cautionary message, I am pleased to join it.  It is my sincere hope that our circuit will be similarly scrupulous in future cases.